837 A.2d 1137 (2003)
365 N.J. Super. 38
STATE of New Jersey, Plaintiff-Respondent,
v.
Anibal RODRIGUEZ, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted December 1, 2003.
Decided December 29, 2003.
*1139 Yvonne Smith Segars, Public Defender of New Jersey, attorney for appellant (Jodi Ferguson, Assistant Deputy Public Defender, of counsel and on the brief).
Bruce J. Kaplan, Middlesex County Prosecutor, attorney for respondent (Simon Louis Rosenbach, Assistant Prosecutor, of counsel and on the brief).
Before Judges HAVEY, FALL and HOENS.
*1138 The opinion of the court was delivered by HAVEY, P.J.A.D.
Defendant was charged under Middlesex County Indictment XX-XX-XXXX with murder, N.J.S.A. 2C:11-3a(1) and N.J.S.A. 2C:11-3a(2) (count one); and six counts of third-degree possession of weapons (machete, knife, scissors, razor blade, screwdriver and a noose) for an unlawful purpose, N.J.S.A. 2C:39-4d (counts two through seven). Tried to a jury, defendant was found not guilty of murder, but guilty of the lesser-included offense of aggravated manslaughter. He was also found guilty of possession of the following weapons for an unlawful purpose: machete (count two); knife (count three); and razor blade (count five). He was acquitted on the remaining charges. After the court merged counts two, three and five into defendant's conviction for aggravated manslaughter, he was sentenced to a thirty-year term of imprisonment, with a fifteen-year period of parole ineligibility. Defendant's post-verdict motion for a judgment of acquittal or for a new trial was denied.
Defendant now appeals, raising the following points:

Point IProsecutorial misconduct deprived defendant of his due process right to a fair trial. U.S. Const. Amend. XIV; N.J. Const. (1947) Art. I, par. 10.

Point IIThe court erred in instructing the jury that if it found defendant not guilty by reason of insanity, he might, or might not, be committed to a mental institution. (Not raised below).

Point IIIThe jury's failure to find that defendant was insane was against the weight of the evidence.

Point IVImposition of the maximum sentence with the maximum parole disqualifier was excessive.

Point VThe VCCB penalty imposed is excessive and imposed with no statement of reasons.
We reverse and remand for a new trial. We conclude that the prosecutor's comments during summation denigrating the insanity defense advanced by defendant deprived him of a fair trial.
Defendant and the victim, Carmen Santos, were neighbors in an apartment building on Smith Street in Perth Amboy. The State presented evidence that defendant bludgeoned Santos to death in his apartment on November 13, 1989. The victim died from an excessive loss of blood resulting from multiple chop, stab, and incise wounds to her face, arms, and torso. During trial, defendant did not dispute his role in Santos' death.
The central issue in the case was defendant's affirmative defense of insanity. According to John Heath, one of defendant's co-workers at a factory in Port Reading, during his employment defendant engaged in odd behavior such as rolling a sandwich on the ground and then eating it. He characterized defendant as a very disturbed person. Defendant told his co-workers and neighbors that he had been hospitalized in Chicago for a brain tumor, *1140 that after an accident a metal plate was placed in his head, and that he had spent time in a Chicago psychiatric hospital.
In the weeks leading to the November 13, 1989 killing, defendant told his co-workers that he had a girlfriend, whom the co-workers assumed lived in defendant's building and received financial support from defendant. Throughout the trial it was presumed that defendant was referring to Santos.
On the day of the homicide defendant worked a full shift but, according to co-workers, he "wasn't himself." Defendant told them that his girlfriend was cheating on him and that "I'm going to kill the goddamn bitch." While making the statement defendant held a razor blade between his fingers.
When defendant returned home after work, he killed Santos. A search of defendant's apartment revealed a machete testing positive for Santos' blood, a pair of scissors, a box cutter, and razor blades. A pocket knife, razor blade and small screwdriver were found on defendant's person when he was hospitalized after the killing.
The evidence suggested that after the killing defendant made attempts to commit suicide. In addition to the numerous stab wounds suffered by defendant, which appeared to be self-inflicted, the police found a noose hanging in defendant's closet. After the killing defendant was observed walking in the street naked and bloodstained. He was later seen naked on a bicycle covered with blood and suffering from multiple cut wounds. While traversing the streets naked, defendant yelled to strangers that "I killed my wife. Go save her. I killed my wife." En route to the hospital in an ambulance, defendant stated, "go to 108 I killed the bitch, go to 108." At the hospital defendant was incoherent, saying that he was God, mentioning Jesus Christ, and that he wanted to play baseball and go fishing. The police read him his Miranda[1] rights and had him sign a Miranda waiver. However, they did not believe that defendant understood his rights, and deemed it impossible to interview him because of his mental condition.
The medical and psychiatric evidence presented by defendant in support of the insanity defense was substantial. Dr. A.P. Swaminathan, a general surgeon who worked in the emergency room of the Raritan Bay Medical Center, described defendant's demeanor upon admission as agitated and uncooperative. Defendant was incoherent and confused and was unable to provide any medical history to the staff.
Dr. Michele Seriye, a psychiatrist, treated defendant on a daily basis for a three to four-day period until he was released from the hospital on November 17, 1989. According to Dr. Seriye, defendant was "acutely psychotic" and "totally incoherent." The doctor tentatively diagnosed defendant as suffering from an organic mental disorder. However, he was unable to give a final diagnosis for a number of reasons, including the doctor's inability to elicit from defendant any coherent answers to medical-history questions. It was Dr. Seriye's belief that he would "not entertain a diagnosis of malingering" based on the information available to him at the time of defendant's treatment. According to the witness, it was a "total impossibility" that defendant was faking his symptoms.
For eleven years from 1989 through 2000, defendant was regularly shuttled between jail and various State psychiatric institutions pending his competency to stand trial.[2] During this period defendant *1141 spent approximately three years and eight months in psychiatric institutions, where he was prescribed a variety of anti-psychotic drugs.
Dr. Charles Gnassi, a psychiatrist, treated defendant for six years between 1989 and 1995. According to Dr. Gnassi, when defendant was medicated his thinking cleared. When unmedicated, however, defendant became delusional and preoccupied with internal stimuli. Defendant talked to himself, speaking nonsense, or simply became catatonic, or mute. Dr. Gnassi's ultimate diagnosis was that defendant suffered from chronic undifferentiated schizophrenia. The doctor also discounted the possibility that defendant was malingering.
Dr. Gnassi opined that, based upon his observations and treatment of defendant, as well as the observation of others immediately after the November 13, 1989 killing, he believed that defendant was psychotic and delusional both immediately before the killing and during the event. In Dr. Gnassi's view, defendant did not understand the nature and quality of his acts on November 13, 1989 as a result of his mental illness. Moreover, Dr. Gnassi did not believe that defendant's apparent suicide attempts, immediately after the killing, were necessarily indicative of remorse. In his view, the suicide attempts were probably further evidence of defendant's psychotic state.
Dr. Mary Sui-Ping Lee, a psychiatrist at Marlboro Psychiatric Hospital, treated defendant during his pretrial incarceration and diagnosed defendant as suffering from chronic undifferentiated schizophrenia. According to Dr. Lee, during his hospitalization at Marlboro defendant was psychotic, incoherent, confused and disoriented. Defendant stated, for example, that he was "100 years old and he has 100 children." Dr. Lee did not believe defendant was malingering or faking mental illness.
Defendant's psychiatric expert, Dr. Oscar Sandoval, concluded that defendant suffers from chronic undifferentiated schizophrenia. He was also convinced that defendant was not feigning his mental illness. Dr. Sandoval believed that defendant had suffered from schizophrenia long before he killed Santos, reaching that conclusion in part on defendant's history of psychiatric illness, including his reported prior hospitalizations.
Dr. Sandoval was of the opinion that both during the killing of Santos, and immediately before, defendant was acutely psychotic and, due to his condition, defendant was unable to differentiate right from wrong, and could not understand the nature or the quality of his acts. In support of these conclusions the witness noted the chronic nature of schizophrenia and that, in the weeks prior to the killing, defendant was observed by co-workers in a depressed state. Dr. Sandoval also cited the inappropriate statements to co-workers, such as his intention to "kill that bitch," which the witness viewed as being "illogical" and inconsistent with a merely antisocial personality. He also cited defendant's incoherence immediately after the killing in front of bystanders and at the hospital. He described defendant's statements and conduct as "bizarre," citing defendant's reference to Santos alternatively as his "wife" and "the bitch."
Dr. Sandoval ruled out the possibility that defendant was having a romantic relationship with Santos. It was his view that the purported "relationship" was one of defendant's delusions.
Dr. Michael Welner, a specialist in the field of forensic psychiatry, testified on behalf of the State. He examined defendant and reviewed defendant's psychiatric and medical records and all of the records *1142 regarding defendant's killing of Santos. He also interviewed a number of defendant's co-workers and family members, the medical examiner who performed the autopsy on Santos, social workers from Marlboro Psychiatric Hospital and several of defendant's neighbors.
Dr. Welner concluded that, at the time defendant killed Santos, he was not suffering from a major mental illness. He further opined that, when defendant killed Santos, he was able to appreciate the nature and consequences of his actions, and he was able to appreciate that what he was doing was wrong. He reached these conclusions based on a number of factors.
First, Dr. Welner noted that defendant had no verifiable history of psychiatric illness. The witness acknowledged, however, there was evidence that defendant had reported prior psychiatric hospitalization to his co-workers. Dr. Welner also discounted defendant's outrageous behavior at work, concluding that defendant was the kind of person who intentionally engaged in outrageous prankster-type behavior in order to make people laugh.
Second, the witness found no evidence that defendant had exhibited signs of mental illness either immediately before killing Santos or in the days leading up to the killing. For example, he found no evidence that during the weeks prior to the killing defendant had suffered from disorganized or bizarre thoughts or behavior, hallucinations, changes in behavior, emotional instability, absenteeism from work or lack of hygiene and self-care.
The third factor supporting Dr. Welner's conclusions was his assumption, contested at trial, that defendant and Santos had been engaged in a romantic sexual relationship. This fact was significant to the witness because the relationship was evidence that defendant was healthy and not mentally ill, and the existence of a romantic relationship between the two and Santos' purported betrayal of defendant gave defendant a rational, non-psychotic motive for having killed the victim. Dr. Welner acknowledged that defendant's statements about the relationship could have reflected delusional thinking. Nevertheless, as further evidence of the romantic relationship, Dr. Welner found it significant that at the crime scene Santos' clothes were found neatly draped over a chair, indicative that Santos had disrobed "without force."
Dr. Welner also cited defendant's history of domestic violence against his ex-wife. The ex-wife had told Dr. Welner that during their marriage defendant occasionally threatened to kill her and sometimes made these threats holding a knife to her throat. The fifth factor was Dr. Welner's reliance on the fact that defendant had killed Santos in his apartment and that after the killing defendant had attempted suicide. To Dr. Welner, these facts indicated that defendant understood that what he was doing was wrong and was remorseful.
Finally, Dr. Welner opined that in the eleven years before trial defendant had been feigning mental illness. In support of this conclusion the witness relied upon statements made by defendant's nephew and ex-wife that, during their pretrial visits with defendant, he appeared normal and presentable. Dr. Welner also cited the fact that defendant experienced no difficulties interacting with staff and other patients. The witness also found it significant that during his initial interview with defendant, defendant claimed he could not remember the killing. But later in the interview, defendant gave a detailed story as to how Santos was killed.

I
Defendant argues that either singularly or in the aggregate, inappropriate comments made by the prosecutor during *1143 summation were so prejudicial as to deprive him of a fair trial. We agree.
The standard for reversal based upon prosecutorial misconduct "requires an evaluation of the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial." State v. Timmendequas, 161 N.J. 515, 575, 737 A.2d 55 (1999), cert. denied, 534 U.S. 858, 122 S.Ct. 136, 151 L.Ed.2d 89 (2001). To justify reversal, the comments must be clearly and unmistakably improper and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his or her defense. State v. Roach, 146 N.J. 208, 219-20, 680 A.2d 634, cert. denied, 519 U.S. 1021, 117 S.Ct. 540, 136 L.Ed.2d 424 (1996). "In determining whether the prosecutor's comments were sufficiently egregious to deny defendant a fair trial, we consider the tenor of the trial and responsiveness of counsel and the court to the improprieties when they occurred." Timmendequas, supra, 161 N.J. at 575, 737 A.2d 55 (citing State v. Scherzer, 301 N.J.Super. 363, 433, 694 A.2d 196 (App.Div.), certif. denied, 151 N.J. 466, 700 A.2d 878 (1977)).
The first of the prosecutor's comments during summation complained of was as follows:
We're told delusions make you act out of touch with reality, gives you the inability to understand what's happening, what's going on, like he was acting after he killed her. Screaming profanities, standing out the window naked yelling he[y], Muchachos, there's someone [who's] got some problems, [who's] got some mental issues, but a person who has the ability to get an athletic young pretty mother of two children who lives upstairs naked alone in his apartment is not a person who is acting under the force of delusion.
[Emphasis added.]
Defense counsel made a timely objection to the comment. The trial court overruled the objection, finding "nothing wrong" with the prosecutor's comment.
Prosecutors may not make inaccurate factual or legal assertions during summation, and they must confine their remarks to evidence revealed during trial, and reasonable inferences to be drawn from the evidence. State v. Smith, 167 N.J. 158, 178, 770 A.2d 255 (2001). Here, there was no evidence adduced at trial that Santos was the mother of two children.
Aside from the fact that the comment was not factually based, defense counsel properly objected to it because it had the clear capacity to focus the jury's attention on the qualities and personal attributes of the victim, which were irrelevant and had the potential of evoking the jury's sympathy and outrage. See State v. Marshall, 123 N.J. 1, 161-62, 586 A.2d 85 (1991); State v. Pennington, 119 N.J. 547, 566-67, 571, 575 A.2d 816 (1990); State v. Williams, 113 N.J. 393, 446-54, 550 A.2d 1172 (1988). Contrary to the State's present argument, Santos'"motherhood" was at best tangentially relevant to the State's theory that defendant was supporting Santos and her children, and that he became angry with her when she rejected his advances. Indeed, during summation the prosecutor did not raise Santos' motherhood in the context of this motive theory. Rather, he used Santos'"motherhood" in the descriptive sense, referring to her as "an athletic young pretty mother of two children."
Standing alone, the prosecutor's comment regarding Santos' motherhood would not, in our view, merit a new trial. Nevertheless, the prosecutor made additional comments denigrating the defense of insanity. The first of these comments was: *1144 It's clear [defendant] did it and that's horrible. That chapter of the book is over. He did it. That's horrible.
Now we go to chapter two. Should we excuse him? Should we give him the benefit of the insanity defense?
[Emphasis added.]
Defense counsel objected to this comment on the ground that the insanity defense was "not an excuse" and "[c]ounsel knows that." The court overruled the objection, stating that the prosecutor's comment was "argument," and that it would instruct the jury on the applicable law. The prosecutor thereupon told the jurors that the court would instruct them that the insanity defense was an "excuse," albeit a "legal excuse." The trial court never gave such an instruction. The prosecutor then added that the defense psychiatrists wanted defendant's conduct to be "criminally excused."
The prosecutor continued with this theme as follows:
You know, the defense's opinion goes something like this. Well, years after the murder he came to us and we think he had schizophrenia, chronic undifferentiated schizophrenia, therefore he killed somebody. We got to give an opinion on that. He must have had chronic undifferentiated schizophrenia before. When you boil it down to the bone that's what they're saying. I submit to you that opinion makes no sense. It's not grounded on any investigation, any thorough analysis, any thought like the State's doctor's opinion is. It's just implausible. And ask yourself when you're analyzing the evidence is he so sick that we're going to excuse him for the murder of Carmen Santos.... His whole psychiatric defense business is so pat and so contrived that I submit to you it's not worthy of your consideration.
....
They did nothing. The defense did nothing. And they come in here and boldly suggest to you that you should let a murder be excused on account of mental illness. Chew on that for a minute, ladies and gentlemen.

....
You're going to have to make a decision that you're going to have to live with. And you got to make this decision just like you make any other decision. You got to decide whether I'm going to say, okay, insanity, excuse, hospitalization work[s] for me or whether you're going to say the evidence of his guilt is overwhelming.

[Emphasis added.]
Finally, the prosecutor stated:
I just want to alert your attention to some of the things [the court is] going to tell you about the insanity defense. [The court is] going to tell you that under our law all persons are presumed sane and [the court is] going to tell you that because of that they are responsible when they commit a crime and there is no question that he killed Carmen Santos. The only way he gets away with a conviction for a crime is the insanity defense.
[Emphasis added.]
Defense counsel objected to this comment. However, the court did not rule on the objection.
At the conclusion of the prosecutor's summation, the trial court reconsidered defense counsel's objections to the prosecutor's reference to the insanity defense as an "excuse" and belatedly sustained them. It advised the jury that "[t]he term `excuse' which you will note here being used does have certain connotations which could lead a finder of fact to conclude that a verdict of not guilty by reason of insanity is inappropriate or illegitimate." Thus, *1145 the court added, the jury should "disregard the use of that material."
It is well settled that prosecutors are not permitted to cast unjustified aspersions on the defense or defense counsel. State v. Frost, 158 N.J. 76, 86, 727 A.2d 1 (1999); Smith, supra, 167 N.J. at 177-78, 770 A.2d 255; see State v. Scherzer, supra, 301 N.J.Super. at 446, 694 A.2d 196 (it is improper for a prosecutor to characterize the defense as "outrageous" or "absolutely preposterous"). Here, fairly read, the prosecutor's comments concerning the "excuse" of the insanity defense had the capacity to denigrate the defense in the eyes of the jury. It also sent a subtle message to the jury that society should not condone "excusing" a heinous crime based on the insanity defense.
The State argues that the prosecutor's comments were justified because case law often refers to the insanity defense as "excusing" a defendant from criminal responsibility. See State v. Worlock, 117 N.J. 596, 601, 569 A.2d 1314 (1990) (a defendant who lacks capacity "is excused from criminal responsibility, but is subject to institutionalization ..."). However, the remarks here were not made in this legal sense. Rather, in context, they had a pejorative connotation, suggesting a "semblance," "subterfuge" or "trick." Webster's New World Thesaurus 260 (Revised Ed.1985). There can be no doubt as to this point, since the prosecutor also referred to a verdict of not guilty by reason of insanity as letting defendant "get away with" the crime of murder. Also, this comment was a clear misstatement of the law. A verdict of not guilty by reason of insanity does not mean that a defendant "get[s] away with" a crime. It means only that he or she has not committed a crime because, although he committed a prohibited act, he did so without the requisite criminal state of mind. State v. Krol, 68 N.J. 236, 246, 344 A.2d 289 (1975) ("[t]here is, in effect, no crime to punish").
In determining whether these remarks were so egregious that they deprived defendant of a fair trial, we must consider the fact that the insanity defense was the central issue in the case. Defendant produced substantial medical and psychiatric evidence concerning defendant's mental state prior to and at the time of the killing. Defendant's psychiatrists presented compelling expert testimony based on this evidence supporting the insanity defense. The State countered this evidence with the testimony of Dr. Welner who opined that, at the time of the killing, defendant was not suffering from a major mental disease, was able to appreciate the nature and consequences of his conduct, and was able to appreciate that what he was doing was wrong.
Clearly, because of the sharp differences in the experts' psychiatric conclusions, the viability of the insanity defense depended entirely on which experts the jury believed. We are satisfied that the prosecutor's persistent characterization in a pejorative context of the defense as an "excuse" could have improperly swayed the jury and thus deprived defendant of a fair trial. In reaching this conclusion we note that the comments resulted in timely and continuous objections by defense counsel and that the trial court initially overruled the objections and did not give an immediate curative instruction. At the conclusion of the prosecutor's summation, the trial court did give an instruction to the jury that the term "excuse" could lead a fact finder to conclude that a verdict of not guilty by reason of insanity was "inappropriate or illegitimate." However, in our view the instruction was too little, too late. During his summation, the prosecutor was given free rein in characterizing *1146 the defense without timely intervention by the trial court.
In addition, the prosecutor's disparagement of the insanity defense may be viewed as even more prejudicial in light of his "battle for justice" comment. He stated:
Listen carefully to what the judge has to say. Listen carefully to the burden that is put upon the defendant to prove to you that he is insane. And when you consider whether he is insane I submit to you accept the opinion of Dr. Welner and you go and deliberate, talk about it, think about it, but come to the only conclusion that the evidence will allow you to come to. Let the battle for justice be won.

[Emphasis added.]
This comment implied that the only way in which justice would be done was if the jury found defendant guilty; justice would not be served if the jury found defendant not guilty by reason of insanity. Our courts have deemed similar comments, standing alone, as warranting reversal of a conviction. See State v. Acker, 265 N.J.Super. 351, 354-57, 627 A.2d 170 (App.Div.), certif. denied, 134 N.J. 485, 634 A.2d 530 (1993) (condemning a warning by the prosecutor to the jury about not doing its job); State v. Rose, 112 N.J. 454, 520-23, 548 A.2d 1058 (1988) (prosecutor erred in exhorting jury to impose death penalty in order to "send a message" to the community and erred in asserting that "the law" mandated the death penalty for defendant). In sum, the cumulative effect of the improper comments by the prosecutor were so prejudicial that a new trial is warranted.

II
Defendant contends that reversal is warranted because the trial court erred in instructing the jury on the legal consequences of a verdict of not guilty by reason of insanity. The issue is raised as plain error. R. 2:10-2. Defendant acknowledges that the charge accurately stated the law. However, he maintains that instructing the jury on the outcome of a not guilty by reason of insanity verdict was inappropriate and prejudicial. We reject the point.
The charge about which defendant complains is as follows:
Now, ladies and gentlemen, a verdict of not guilty by reason of insanity does not necessarily mean that the defendant will be freed or that the individual will be indefinitely committed to a mental institution. Under our law, if you find the defendant not guilty by reason of insanity it will then be for the Court to conduct a further hearing and among other matters determine whether or not the defendant's insanity continues to the present and whether the defendant poses a danger to the community or to himself. The resolution of those issues will ultimately determine what appropriate restrictions need to be placed on the defendant. Therefore, procedures exist to adequately provide for the defendant and to protect the public in the event the defendant is found not guilty by reason of insanity.
As noted, defense counsel did not object to the charge at trial.
The charge is a verbatim recitation from the applicable Model Jury Charge, Model Jury Charge (Criminal), "Insanity" (Oct.1988), and is consistent with controlling New Jersey precedent. State v. Krol, supra, 68 N.J. at 265, 344 A.2d 289. See also generally Thomas M. Fleming, Annotation, Instructions in State Criminal Case in Which Defendant Pleads Insanity as to Hospital Confinement in Event of Acquittal, 81 A.L.R.4th 659, 675-86 (1990) (nationwide collection of cases which hold that charge on consequences of verdict of not guilty by reason of insanity generally appropriate *1147 upon request of defendant or absent a defense objection). But see Shannon v. United States, 512 U.S. 573, 580-87, 114 S.Ct. 2419, 2424-28, 129 L.Ed.2d 459, 467-71 (1994) (holding that federal courts are not required to instruct a jury regarding the consequences to defendant as to a not guilty by reason of insanity verdict under the Federal Insanity Defense Reform Act of 1984 or "as a matter of general federal criminal practice"). We therefore find no error in the trial court's giving of the instruction which tracked the Model Jury Charge.

III
In view of our reversal of defendant's convictions based on the improper comments made by the prosecutor during summation, we need not reach defendant's alternative argument that his new trial motion should have been granted on the basis that the jury's rejection of his insanity defense was against the weight of the evidence. We also need not address defendant's excessive sentence contentions.
Reversed and remanded for a new trial.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Prior to the commencement of his trial, competency was stipulated by defendant.