**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5820-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JUSTIN GARCIA a/k/a
EAZE GARCIA,

    Defendant-Appellant.

_____

Submitted May 27, 2020 – Decided July 9, 2020

Before Judges Accurso, Gilson and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 17-01-0055.

Joseph E. Krakora, Public Defender, attorney for appellant (Daniel Vincent Gautieri, Assistant Deputy Public Defender, of counsel and on the brief).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Ednin D. Martinez, Assistant Prosecutor, on the brief).

PER CURIAM

Following a bifurcated jury trial, defendant Justin Garcia was convicted of murder and weapons offenses for the execution-style shooting death of his friend, Javon Murray; thereafter, the same jury convicted defendant of certain persons not to have weapons. After denying defendant's motion for a new trial and the State's motion for a discretionary extended term, the trial court ordered the appropriate merger, ran all remaining counts concurrently, and sentenced defendant to an aggregate term of life imprisonment. Pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, defendant must serve nearly sixty-four years in prison before he is eligible for parole.

During the multi-day jury trial, the State presented the testimony of ten witnesses and introduced in evidence more than one hundred exhibits. But no one witnessed the shooting; the weapon was not recovered; and no projectiles or shell casings were found at the scene. Instead, the evidence against defendant was largely circumstantial: surveillance video footage and defendant's cell phone records captured his actions during the minutes leading up to the shooting; cell tower information tracked defendant's activity – and inactivity – in the hours that followed. And a mutual friend of defendant and Murray heard the gunshot, saw defendant run away from the scene, and saw another man pick up the gun. Defendant did not testify at trial.

A-5820-17T1

Defendant now appeals, arguing:

## POINT I

THE PROSECUTOR COMMITTED MISCONDUCT IN HER SUMMATION IN MULTIPLE WAYS, INCLUDING VOUCHING FOR HER EYEWITNESS'S CREDIBILITY BASED ON INFORMATION OUTSIDE THE TRIAL RECORD AND PROVIDING MISLEADING INFORMATION REGARDING THE REASONABLE-DOUBT STANDARD.
(Not Raised Below)

## POINT II

THE INSTRUCTION ON FLIGHT AS CONSCIOUSNESS OF GUILT WAS UNCONSTITUTIONAL BECAUSE IT SHIFTED THE BURDEN OF PROOF FROM THE STATE TO THE DEFENDANT.
(Not Raised Below)

## POINT III

THE COURT ERRED IN IMPOSING A LIFE SENTENCE WITH A 63.75-YEAR PAROLE BAR ON [DEFENDANT], FOCUSING LARGELY ON THE FACT THAT [DEFENDANT] MAINTAINED HIS INNOCENCE IN IMPOSING SUCH A LONG TERM UPON A YOUTHFUL OFFENDER WHO HAD NEVER PREV[]IOUSLY BEEN SENTENCED TO PRISON.

## POINT IV

THE COURT ERRED IN IMPOSING FINANCIAL PENALTIES ON A MERGED COUNT.

3                                                    A-5820-17T1

(Not Raised Below)

After consideration of the trial testimony and the arguments raised on appeal, we affirm defendant's convictions, finding insufficient merit in the contentions raised in point II to warrant extended discussion in this written opinion, R. 2:11-3(e)(2), beyond the comments that follow. We focus instead on point I. We also reject the contentions raised in point III and affirm defendant's sentence, but remand to correct the judgment of conviction to remove the fines assessed on the merged conviction.

## I.

Sometime between 2:40 and 2:44 a.m. on July 21, 2016, Murray was shot from behind by a single bullet. Jersey City police detectives assigned to a nearby precinct heard the gunshot and within minutes were dispatched to the scene on Clinton Avenue. By the time they arrived, Murray had died; he was still clutching money in his hand. Police found two cell phones and a small bottle of alcohol in Murray's pocket, arguably ruling out robbery as a motive for the shooting. One of the responding detectives testified the windshield of a blue Ford Expedition next to Murray's body was struck by a bullet at an upward angle. According to the medical examiner, a single bullet entered Murray's neck below his left ear; traveled at a slight upward angle; and exited his cheek near his right

ear, severing the spinal cord. The entrance wound was situated seven-and-one-half inches below the top of Murray's head; the exit wound six inches below.

Around the time of the shooting, a few young adults – including nineteen-year-old N.C. (Nancy)[1] – were in the area. Around 11:30 p.m. on July 20, Nancy ran into Murray on Clinton Avenue and they spoke for a few minutes about "the usual stuff" friends discuss. Sometime later, defendant approached Nancy and told her to contact Murray and "ask him where he was." Nancy did not comply with defendant's "persistent" demands and walked away when another friend, Faith Skipper, met up with her. Nancy and Skipper then walked to a fast food restaurant.

About twenty minutes later, Nancy and Skipper returned to Clinton Avenue. Nancy entered the home of her friend, Ruby,[2] while Skipper remained outside. As Nancy was entering the home, she "saw a person in all black, [a] short person[3] going through the alleyway between the house [sic]." A few

---

[1] Because we find the witness's safety outweighs the Judiciary's commitment to transparency in this opinion, we use initials to protect her privacy and a pseudonym for ease of reference.

[2] Ruby's last name is not contained in the record; we intend no disrespect by using her first name.

[3] Nancy testified the man was about her height: four feet, eleven inches tall. A detective later testified defendant is five feet, one inch tall.

A-5820-17T1

minutes later, Nancy joined Skipper and two other friends – Kenneth Bernavil and Talik Smith – who were "chilling" in Bernavil's BMW.  The car was parked across the street from Ruby's house.

Nancy testified that the group was "just talking and everything and then after a while [they] heard the shot."  Nancy did not see the shooting; when she heard the gunshot, she turned and saw Murray fall to the ground.  Nancy then saw the "same person, same height . . . run . . . through the alley again" and "[d]rop the gun."  Nancy observed another man pick up the gun and hand it to a third man before leaving; both men were taller than the gunman.  Nancy stayed behind to check on Murray while Bernavil drove off in the BMW with Smith and Skipper.  Realizing "something was wrong," Nancy reentered Ruby's home. The next day, Nancy was interviewed by police.

During her trial testimony, Nancy acknowledged she initially told police the shooter was "short with dreads" and "had a white shirt with blue pants on," which differed from her trial testimony, but was consistent with the surveillance footage shown to the jury.  Nancy selected defendant's photograph from an array during her interview.  Hudson County Prosecutor's Office (HCPO) Detective Paulo Hernandez, who performed the array, testified Nancy was "scared and hesitant" when doing so.  Nancy also identified defendant in court as the shooter.

6

Defense counsel questioned Nancy about her prior statements to police, some of which were inconsistent with her trial testimony. As one example, on cross-examination Nancy said she saw Murray enter a white van with several other unidentified people before the shooting. But Nancy told police she saw Murray enter a white van with Jared, her former boyfriend. Nancy also told police she did not go to the fast food restaurant with Skipper, but stayed behind with Ruby, Smith, and Bernavil. On redirect examination, Nancy stated she did not immediately disclose all details to the detectives because she was "scared" and "didn't know what to do." Although Nancy denied she was frightened while testifying, her demeanor suggested otherwise.[4]

The State also called Bernavil, who did not see the shooting and thought the "pop" he heard at that time was caused by a garbage truck as it was driving down the block. Police stopped Bernavil's car as he was driving away. Bernavil

---

[4] During their summations, defense counsel and the prosecutor commented on Nancy's nervous demeanor while testifying. In her oral decision, denying defendant's motion for a new trial, the court made detailed findings about Nancy's demeanor: "[Nancy] appeared visibly terrified entering the courtroom . . . . As she entered the witness stand she whimpered making what the [court will] call for a lack of a better description, primordial sounds, akin to a frightened or wounded animal." The court recalled "hear[ing] [Nancy] breathing to keep herself calm and composed . . . . Most telling was the way she positioned herself during the course of her testimony." Nancy "moved to the rear of the witness stand" and "shield[ed] herself from the view of . . . defendant . . . ."

allowed police to search the car, where they found a spent shell casing in a crevice of the front seat. Police detained Bernavil, Smith, and Skipper, but none of the occupants was charged in connection with Murray's murder. Bernavil, who was studying criminal justice and "regularly" fired weapons at the shooting range, told police he had done so earlier that day. The State moved into evidence a photograph of Bernavil firing guns at the shooting range a few days before the incident.

HCPO detectives obtained surveillance footage from several businesses and residences near the scene of the shooting, which were played for the jury at trial without narration. One surveillance video depicts a man matching Nancy's description of defendant – a male with dreadlocks wearing a white shirt, blue pants, and a baseball cap – entering a liquor store near the crime scene a few hours before the shooting. Another surveillance video shows a similarly dressed man, without a baseball cap, crouching down near a car on Clinton Avenue and placing an object in the waistband of his pants about forty minutes before the shooting. The same man appears in a third video with another man, believed to be Murray, walking on Clinton Avenue shortly before the shooting.[5]

---

[5] None of the videos depicted the murder; apparently footage had been erased from one of the videos before it was turned over to police.

HCPO detectives also extracted data from defendant's cell phone, pursuant to a communications data warrant. The State's telecommunications analysis expert, HCPO Detective Sean O'Leary, testified that defendant's phone continuously activated cell towers on Clinton Avenue and Kennedy Boulevard in the month leading up to the shooting. O'Leary opined defendant never left the southern area of Jersey City for more than a few hours during that timeframe.

In the minutes leading up to the murder, defendant exchanged messages with Geetay Sal, Kishan Sparkman, and someone identified in defendant's phone only as "Stars." Around the time of the shooting – at 2:20 a.m. and 2:40 a.m. – defendant's phone activated a cell tower near Clinton Avenue. Shortly after the shooting – at 2:44:58 a.m. and 2:45:38 – defendant placed two calls to Sal. And about a half-hour later defendant called Sparkman.

During the next thirty-four hours, "multiple people" attempted to contact defendant, but his phone did not text or call anyone. Defendant's phone did not activate another cell tower until 7 p.m. on July 21. Unlike defendant's cell tower activations during the month before the murder, that cell tower was located in the northern end of Jersey City. Defendant's phone continued to activate cell towers in the northern section of the city.

On July 22, defendant's phone accessed an online news article regarding

the homicide, which stated the shooter was at large and police sought the public's assistance with any leads. After accessing the article, defendant resumed outgoing communications with his phone. HCPO Detective Brenton Porter testified by that time, police were no longer canvassing the area around the crime scene.

On July 23, defendant's cell phone resumed activating cell towers near Clinton Avenue. That afternoon, defendant messaged Dominick Rodriguez, who lives in Florida, and asked whether he "could come out there for a little while[.]" Rodriquez asked defendant the reason for his visit. Defendant replied: "Too much to say on the phone . . . ." When Rodriguez pressed defendant for more information, defendant said his reason "had nothing to do with money, wasn't even my beef . . . my boy just got killed three days ago." Defendant told Rodriguez he would likely leave for Florida the following day. About a half-hour later, defendant messaged Sal asking, "why people are saying [sic] that Toya told?" Police identified Toya as Murray's friend or girlfriend. On July 25, 2016, defendant was arrested.

II.

For the first time on appeal, defendant challenges several comments made during the prosecutor's summation. Because no objections were made at trial,

we conduct our review by employing the plain error standard. In that regard, "[w]e may reverse on the basis of unchallenged error only if the error was 'clearly capable of producing an unjust result.'" State v. Ross, 229 N.J. 389, 407 (2017) (quoting R. 2:10-2).

In reviewing a claim of prosecutorial misconduct, we consider whether: defense counsel raised "timely and proper objections"; "the offending remarks were withdrawn promptly"; "the trial court struck the remarks and provided appropriate instructions to the jury"; and "the offending remarks were prompted by comments in the summation of defense counsel." State v. Smith, 212 N.J. 365, 403-04 (2012) (internal citations and quotation marks omitted). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." State v. R.B., 183 N.J. 308, 333 (2005) (citation omitted). "Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made," and "deprives the court of the opportunity to take curative action." State v. Timmendequas, 161 N.J. 515, 576 (1999).

Moreover, New Jersey courts have long recognized prosecutors "are afforded considerable leeway in making opening statements and summations." State v. Williams, 113 N.J. 393, 447 (1988). They may even do so "graphically

and forcefully." State v. Pratt, 226 N.J. Super. 307, 323 (App. Div. 1988).

Nonetheless, "the primary duty of a prosecutor is not to obtain convictions but to see that justice is done." Smith, 212 N.J. at 402-03. A prosecutor's "duty is to prove the State's case based on the evidence and not to play on the passions of the jury or trigger emotional flashpoints, deflecting attention from the hard facts on which the State's case must rise or fall." State v. Blakney, 189 N.J. 88, 96 (2006). "A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times his or her 'remarks and actions [are] consistent with his or her duty to ensure that justice is achieved.'" State v. Jackson, 211 N.J. 394, 408 (2012) (alterations in original) (quoting Williams, 113 N.J. at 447-48).

Even if the prosecutor exceeds the bounds of proper conduct, that finding does not end our inquiry "because, in order to justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'" State v. Smith, 167 N.J. 158, 181 (2001) (quoting State v. Frost, 158 N.J. 76, 83 (1999)). "To justify reversal, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense."

Timmendequas, 161 N.J. at 575 (citation omitted); see also State v. Nelson, 173 N.J. 417, 460 (2002).

Against that legal backdrop, we turn to defendant's overlapping claims that the prosecutor impermissibly vouched for Nancy's credibility and bolstered her testimony with evidence outside the trial record; denigrated defense counsel by stating he "spun kind of a tale" about the killer's identity; and mischaracterized the "reasonable doubt" standard by referring to defense counsel's theories as "imaginary doubt." Defendant argues those cumulative errors denied him a fair trial. Having reviewed the prosecutor's summation "within the context of the trial as a whole," State v. Feaster, 156 N.J. 1, 64 (1998), we reject defendant's belated contentions.

We begin by summarizing defendant's arguments to give context to the prosecutor's closing remarks at issue. Defendant's trial strategy focused on impeaching the credibility of Nancy and poking holes in the State's circumstantial evidence that tied him to the shooting. During summation, defense counsel argued, "[Nancy] never said that she saw [defendant] fire a gun." Counsel then noted the State will ask the jury "to draw certain inferences from certain facts that [Nancy] did say and try to bring [it] to a conclusion saying that [defendant] must have been the one that did this."

In seeking to discredit Nancy, defense counsel cited portions of her testimony that differed from her prior statements to police. For example, counsel argued: "Clearly, she lied" when Nancy said she did not know the occupants of the white van. He also cast doubt on Nancy's statement that she saw defendant drop the gun and another man pick it up and hand it to a third man. Counsel reviewed with the jurors the trial court's ensuing "false in one, false in all" charge in relation to Nancy's testimony. See Model Jury Charges (Criminal), "False in One – False in All" (rev. Jan. 13, 2013) (instructing jurors that they may believe all or some of a witness's testimony if they find the witness "willfully or knowingly testified falsely to any material facts in the case, with intent to deceive [them]"). Counsel said Nancy "seemed to be very nervous" when she testified, arguing people "get nervous because they're not supposed to be lying . . . ."

Defense counsel also suggested arguments the prosecutor would make during her summation concerning the shooter's height:

> The prosecutor is going to argue to you, I believe, too many points that they say is [sic] corroboration. They're [sic] going to say that the victim was 5'9, that [defendant] is 5'2 and that the angle of the bullet path was slightly upward, so it must have been a short person who shot [Murray].

And, defense counsel also suggested someone else, including Bernavil,

14

could have killed Murray. Toward the end of his summation, counsel showed the jury the photograph of Bernavil firing a rifle at the shooting range, with two other handguns "on the board, right in front of where he's shooting . . . ." Counsel then asked the jury: "What does that mean? Does that mean that [Bernavil] did it? I don't know . . . we don't know. There's not enough evidence before you to make a decision about that."

Defendant now claims the prosecutor impermissibly vouched for Nancy's credibility, and referred to evidence not presented at trial to bolster Nancy's credibility. Defendant notes the following comments as indicia of vouching and bolstering by the prosecutor:

> [Nancy] was so terrified she didn't even want to walk in the courtroom. She was terrified out here. And, we're supposed to believe that she sat up here with the intent to look all of you in the face and just lie about everything. And, if she was going to lie, . . . what was the reason for it. Because that's another factor for you to consider . . . bias, whether there's a motive to lie, whether she has an interest in the outcome of the case.
>
> She doesn't . . . she has no motive to lie. And, if she did, if she did have a reason to lie, if she did have a reason for whatever reason to put this on . . . defendant, why wouldn't she say, I saw him pull the trigger? She didn't say it because she didn't see it and because she was telling you the truth.
>
> . . . .

A-5820-17T1

> She was terrified to initially identify him. And, she was terrified in here to identify him. [Nancy] is a young woman who we can see just wanted to do the right thing. That's all she wanted to do.

The prosecutor's comments followed defense counsel's skillful attempt to discredit Nancy's testimony and question the reason for her demeanor by arguing inconsistencies in Nancy's testimony and her "nervous" responses were indicia of her untruthfulness. The prosecutor neither expressed a personal belief or opinion as to the truthfulness of Nancy's testimony, see State v. Staples, 263 N.J. Super. 602, 605 (App. Div. 1993), nor attempted to vouch for her credibility, State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004). Rather, taken in context, the comments were made in response to defendant's argument. See State v. Marshall, 123 N.J. 1, 156 (1991) (finding it proper for a prosecutor to argue that a witness's testimony is credible, but improper to offer an opinion on the witness's credibility). And, the prosecutor's comments were based on the evidence in the trial record. See Blakney, 189 N.J. at 96. Not only did the detective who conducted the array testify that Nancy was "scared" when she identified defendant as the shooter at the police station, but also as noted above, the court detailed Nancy's "visibly terrified" demeanor in court.

Defendant cites other portions of the prosecutor's summation to further support his argument that the prosecutor bolstered Nancy's testimony with facts

16

that were not in evidence. Defendant takes issue with the prosecutor's "evaluation of the crime scene":

> So, the entrance wound . . . was 4'10 and a half inches off the ground at that slightly upward trajectory . . . . [D]efendant was 5'1 at the time of the murder. So, think about this. Even if you've never shot a gun before, you know what the obvious stance is when you're about to shoot someone, right?
>
> You go to eye level. You don't go from the top of your head. You go from eye level because you want to see your target. What do you think the eye level is from the top of [defendant]'s head? Two to three inches? 5'1 minus two to three inches is 4'10 and a half inches off the ground.
>
> Do you think it's just a coincidence that the entrance wound to the victim perfectly matches up with [defendant]'s eye level[?]

The prosecutor's comments were based upon the "evidence revealed during the trial and reasonable inferences . . . drawn from that evidence." Smith, 167 N.J. at 178. Although the medical examiner testified he could not state the shooter's height "within a reasonable degree of medical certainty," he stated the victim's height, and Porter testified as to defendant's height. The medical examiner also detailed his measurements of the entrance and exit wounds vis-à-vis the crown of Murray's head, and the trajectory of the bullet as it entered the victim's skull. Considering the prosecutor's statements in the context of the trial

as a whole, Feaster, 156 N.J. at 64, a reasonable jury could infer from the evidence adduced that defendant matched the approximate height of the shooter.[6]

Moreover, "[a] prosecutor is permitted to respond to an argument raised by the defense so long as it does not constitute a foray beyond the evidence adduced at trial." State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001). As stated, defense counsel expressly fronted the disparity in heights between defendant and Murray and the angle of the bullet's trajectory, commenting that the prosecutor will argue the shooter was shorter than the victim. Counsel then asked the jury, "I don't know, what do you think about that argument? I don't think very much of it." We discern nothing improper or factually incorrect about the prosecutor's responsive comments. See Frost, 158 N.J. at 85.

Nor are we persuaded by defendant's assertions that the prosecutor improperly speculated about defendant's ability to change his clothes, and the meaning of a text message sent after the shooting. At issue are the following remarks:

---

[6] To support his argument on appeal that "there is no one perfect shooting stance," defendant cites an article written by a retired detective that is not contained in the trial record. Accordingly, it is inappropriate for our consideration on appeal. See State v. Robinson, 200 N.J. 1, 20 (2009).

You saw from the liquor store video that . . . defendant was wearing a baseball cap. In the later videos, he's not wearing a baseball cap. We know from the phone records, he hasn't left the area of Clinton Avenue. What does that suggest? He's got a place where he can go to stash clothes, to change clothes in that area. He's there every day.

So, it's not a stretch. It's not an imaginary doubt. It's reasonable to conclude that he had a place where he could change his clothes, to throw on a dark hoodie, especially when there's [sic] thirty-five minutes between when he arms himself and when the victim is standing there.

. . . .

[Defendant] reaches out to [a friend] and he says, "Yo, why are people saying Toya told?" Do you remember who Toya was? Detective Porter testified Toya is Alexis Brown . . . the girlfriend or friend of the victim.

. . . .

Why would you ask the question if you didn't do it? Why would you care? Because he did do it. Because he found out somebody told and he's asking . . . why are people saying Toya told.

[(Emphasis added).]

Again, the prosecutor's statements were reasonably-based inferences from the evidence adduced at trial. As to the garment-changing comments, the State presented cell site data, indicating defendant had been present continuously in the vicinity of the shooting for one month. The State also presented Nancy's

19

conflicting accounts regarding defendant's clothing at and near the time of the crime. In an attempt to explain the inconsistencies in Nancy's statements, the prosecutor asked the jury to infer from those facts that defendant changed his clothing. And, regarding defendant's inquiring text message, the prosecutor questioned defendant's motive, suggesting the message was indicative of his guilt. The jury reasonably could infer from the text message that defendant was concerned "Toya" was disclosing information about the crime to others. In our view, the prosecutor's remarks did not exceed the bounds of fair comment on the evidence. See Smith, 167 N.J. at 178.

Lastly, we turn to defendant's contentions that the prosecutor's references to imaginary doubt mischaracterized the reasonable doubt standard, and that her comment, "as to the killer's identity, defense counsel has spun kind of a tale for you, right[,]" denigrated defense counsel. Defendant also cites the following comments to support his argument:

> Because there's imaginary doubt, which you can reject. And, then there's reasonable evidence. Defense counsel wants you to think that all of this evidence is unreliable or if it is reliable, it's all merely a coincidence . . . evidence like [Nancy's] testimony.
>
> He wants you to think it's all unreliable because it all incriminates his client. Or he wants you to think it's all a coincidence because he wants you to look the other way. He wants you to look away from all of this

evidence because it all leads to only one person as the murderer, . . . defendant.

. . . .

Direct evidence like somebody's eyewitness testimony, that gives us a snapshot in time. But, the circumstantial evidence, that gives us the whole story. Can you ignore all of these things or call them all just coincidence, and still have them be reasonable?

That's the difference between imaginary doubt and reasonable doubt. Anything is possible . . ., but is it reasonable? Can you ignore these things and still have it be reasonable? If it's imaginary or unreasonable, you can reject it. But, follow the evidence . . . and find this man guilty.

"It is well settled that prosecutors are not permitted to cast unjustified aspersions on the defense or defense counsel." State v. Rodriguez, 365 N.J. Super. 38, 50 (App. Div. 2003); see also Frost, 158 N.J. at 86. We have long recognized prosecutors may not "characterize the defense attorney and the defense as outrageous, remarkable, absolutely preposterous and absolutely outrageous." State v. Acker, 265 N.J. Super. 351, 356 (App. Div. 1993); see also State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008).

In context, the prosecutor's suggestion that counsel "spun kind of a tale," while perhaps better avoided, was not egregious or unfair and did not have the capacity to bring about a result the jury might not otherwise have reached. See

<u>Timmendequas</u>, 161 N.J. at 589-90. The prosecutor challenged the viability of defendant's case theory in response to counsel's assertions that some unspecified person could have killed Murray. To the extent that fleeting remark could be viewed as improper, we conclude it does not rise to plain error. <u>See</u> <u>R.</u> 2:10-2.

Turning to the prosecutor's "imaginary doubt" references, we note defendant's recitation of the prosecutor's comments in this regard omitted her introduction: "But, you have to ask yourselves this, how much of what defense counsel said to you is supported by the evidence." The comments should be contextualized amid the prosecutor's discussion of Nancy's credibility and the circumstantial evidence that underscored defendant's guilt in response to counsel's arguments, which the prosecutor contended found no support in the record. We discern no impropriety in that argument.

The use of the term "imaginary doubt" in those contexts, however, should have been avoided because it could have been construed as the prosecutor's instruction to the jury on the law. Nonetheless, we are persuaded any prejudice resulting from those comments was sufficiently mitigated by the trial court's thorough instruction on reasonable doubt, which tracked the model jury charge verbatim. <u>See</u> <u>Model Jury Charges (Criminal)</u>, "Reasonable Doubt" (rev. Feb.

24, 1997).[7] The court also properly instructed the jury it was the sole judge of witness credibility and that counsels' arguments or comments are not evidence. "We must assume the jury followed the court's instructions." See State v. Little, 296 N.J. Super. 573, 580 (App. Div. 1997). Accordingly, the prosecutor's remarks were not sufficiently egregious to find defendant was deprived of a fair trial. Frost, 158 N.J. at 83.

Finally, we reject defendant's contention that the cumulative effect of the errors committed during his trial warrants reversal. Defendant has failed to demonstrate any error or pattern of errors, rising to the level, either singly or cumulatively, that denied him a fair trial. "A defendant is entitled to a fair trial but not a perfect one." R.B., 183 N.J. at 334 (internal quotation marks omitted).

## III.

Little need be said about defendant's newly-minted challenges to the trial court's flight instruction. During the charge conference, defense counsel

---

[7] Although the present model jury charge on reasonable doubt does not reference "imaginary doubt," its predecessor provided, in pertinent part: "Reasonable doubt is not a mere possible or imaginary doubt, because everything relating to human affairs is open to some possible or imaginary doubt." Model Jury Charges (Criminal), "Reasonable Doubt" (rev. May 23, 1994); see also State v. Medina, 147 N.J. 43, 61 (1996) (adopting the present definition of reasonable doubt and "direct[ing] trial courts not to deviate from [that] definition"). Prosecutors likewise should not deviate from that definition.

opposed the State's application to charge flight and sought a mere presence instruction. The court considered the arguments of counsel; reserved decision; and thereafter ruled both charges would be included in its final jury instructions. The court's flight charge as given was closely tailored to the model jury charge, omitting only the following language: "There has been some testimony in the case from which you may infer that the defendant fled shortly after the alleged commission of the crime. The defense has suggested the following explanation[.]" See Model Jury Charges (Criminal), "Flight" (rev. May 10, 2010). The court omitted that text based on its "conscious decision not to indicate or provide potential facts . . . for the jur[ors] to consider" because that could "indicate undue weight to those facts. And, in the end, it's their decision to consider what facts to find and how much weight to give them." Defendant did not object to the instruction as given.

Defendant now claims the flight instruction improperly placed the burden on him "to dis-prove that he left in order to avoid arrest, when it should have placed the burden on the State to prove that he left to avoid arrest." Defendant further contends the flight instruction should not have preceded the substantive charges. Defendant cites no authority to support either contention, and we find

insufficient merit in either claim to warrant discussion in this opinion, R. 2:11-3(e)(2), beyond the following brief comments.

The trial court's flight charge in this case was nearly a verbatim recitation of the model jury charge and consistent with New Jersey precedent. See State v. Mann, 132 N.J. 410, 421 (1993). We have repeatedly held a jury charge that tracks the language of the governing law and is consistent with the applicable model jury charge is not plainly erroneous. See Rodriguez, 365 N.J. Super. at 53-54. Nor do we find any error in the placement of the flight charge within the jury instructions. The charge was issued immediately after the mere presence charge and before the substantive charges. We therefore discern no error let alone plain error in the substantive charge or its placement within the overall instructions. See R. 1:7-2; R. 2:10-2; see also State v. Funderburg, 225 N.J. 66, 79 (2016).

IV.

The crux of defendant's sentencing argument is the trial court's assignment of weight to the aggravating factors it found applicable. Defendant primarily claims the court improperly considered and assigned great weight to his lack of remorse and refusal to accept responsibility. Defendant also contends the court failed to consider his "relative youth" and lack of prior confinement in a state

25

prison facility in imposing sentence beyond the thirty-year mandatory-minimum prison term.   See N.J.S.A. 2C:11-3(b)(1).   Defendant's contentions are unavailing.

After merging the possession of an unlawful purpose conviction with the murder conviction, the court sentenced defendant to life imprisonment with an eighty-five percent period of parole ineligibility under NERA, and concurrent terms of ten years with five years of parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c), for the unlawful possession of a weapon and certain persons not to have weapons convictions.   The court found and assigned "substantial weight" to aggravating factor three (the risk defendant will commit another offense), "heav[]y weigh[t]" to aggravating factor six  (the extent of defendant's criminal history), and the "most weight" to aggravating factor nine (general and specific deterrence), N.J.S.A. 2C:44-1(a)(3), (6), and (9).  Finding no mitigating factors, N.J.S.A. 2C:44-1(b), the court was "clearly convinced that the aggravating factors substantially outweigh[ed] the mitigating factors."

In finding and assessing the aggravating factors, the trial court thoroughly reviewed defendant's personal history and criminal background, which included six prior indictable convictions, and multiple violations of probation. Recognizing defendant was twenty-seven years old on the day of sentencing, the

court noted defendant "has spent his entire . . . adult life involved with the criminal justice system." The court found defendant had been afforded "numerous opportunities to rehabilitate and to make a good-faith effort to change and become a contributing member of society[,]" but his "unlawful conduct [ha]s only increased in frequency and gravity since his initial conviction as an adult."

In its assessment of aggravating factor three, the court assigned "great weight" to defendant's "apparent lack of remorse" toward Murray and his family "along with defendant's persistent refusal to accept responsibility for his actions as noted in his pre-sentence interview." The court elaborated:

> Given the circumstances of defendant's continued contacts with the criminal justice system, with the calculated and violent execution-like manner in which this jury found that the defendant murdered Javon Murray and . . . defendant's (indiscernible) position while blaming others such as his attorney, th[e] court finds . . . aggravating factor three and gives it substantial weight.

Sentencing determinations are reviewed on appeal with a highly deferential standard. State v. Fuentes, 217 N.J. 57, 70 (2014). "The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3)

27

'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). Once the trial court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b), it "may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010). See also State v. Case, 220 N.J. 49, 65 (2014) (instructing that appellate courts may not substitute their judgment for that of the sentencing court, provided that the "aggravating and mitigating factors are identified [and] supported by competent, credible evidence in the record").

We have previously warned against the use of a defendant's refusal to admit guilt to increase a sentence. See State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985) (noting our "view that a defendant's refusal to acknowledge guilt following a conviction is generally not a germane factor in the sentencing decision"). We have, however, found a "[d]efendant's consistent denial of involvement and . . . lack of remorse" supported a finding of aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), and "indicate[d] that a prison sentence [wa]s necessary to deter [the] defendant from similar conduct in the future . . . ." State v. Rivers, 252 N.J. Super. 142, 153-54 (App. Div. 1991). And, in State v. Carey,

28

our Supreme Court recognized a sentencing court may consider the defendant's failure to take responsibility in support of aggravating factor three. 168 N.J. 413, 426-27 (2001) (upholding the court's finding of aggravating factor three where the defendant "expresse[d] remorse, but [did] not directly accept responsibility for the [car] crash or admit that he ha[d] a problem of drinking and driving").

Our review of the record leads us to conclude the aggravating factors found were based on competent credible evidence in the record. Indeed, defendant does not challenge those findings on appeal. At first blush, the court's assignment of great weight to defendant's lack of remorse and refusal to accept responsibility gives us pause. However, in its consideration of aggravating factor three, the court properly considered defendant's recidivism, violations of probation, and that the present offense was committed while defendant was released on bail. Accordingly, the court's remarks were not the sole bases for its application of aggravating factor three. Moreover, the court assigned the "most weight" to aggravating factor nine and did not consider defendant's lack of remorse or refusal to accept responsibility in that regard. As the court correctly determined, defendant's prior probationary and jail terms have not deterred his criminal activity.

Defendant's remaining sentencing contentions lack sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(2). We simply note defendant's reliance on the neuroscience underscoring Graham v. Florida, 560 U.S. 48 (2010), and State v. Zuber, 227 N.J. 422 (2017), is misplaced. In Graham and Zuber, the Courts considered the impact of life sentences on juvenile offenders. Graham, 560 U.S. at 117; Zuber, 227 N.J. at 452-53. Conversely, defendant was twenty-five years old when he committed the murder and twenty-seven when he was sentenced to life imprisonment. As such, the principles espoused in Graham and Zuber are inapplicable here.

Our review of the record leads us to conclude the sentencing guidelines were followed, the aggravating and mitigating factors were based on competent credible evidence in the record, and the application of the guidelines to the "execution-like" murder resulted in a sentence that was reasonable under the facts of the case and do not "shock the judicial conscience." Roth, 95 N.J. at 364-65. Given our deferential standard of review, we see no reason to second guess the trial court's sentence. Fuentes, 217 N.J. at 70.

* * *

In sum, we affirm defendant's convictions and sentence. But we direct the trial court to amend the judgment of conviction to remove the fines assessed on

the possession of a weapon for an unlawful purpose conviction, which the court correctly merged with the murder conviction. The amended judgment of conviction shall also remove the merged count from the list of final charges.

Affirmed but remanded to correct the judgment of conviction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5820-17T1