**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0565-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RYAN D. KEOGH,
a/k/a RYAN KEOGH,

     Defendant-Appellant.

_____

Argued January 8, 2025 – Decided March 4, 2025

Before Judges Rose, DeAlmeida and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 19-05-0288.

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Stephen W. Kirsch, on the brief).

Emily M. M. Pirro, Assistant Prosecutor, argued the cause for respondent (John P. McDonald, Somerset County Prosecutor, attorney; Emily M. M. Pirro, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

A jury convicted defendant Ryan D. Keogh of murder and related weapons offenses for the January 8, 2019 shooting death of Terrance Coulanges at defendant's home in Bound Brook; endangering an injured victim for leaving the scene of the shooting, knowing Coulanges was injured; and hindering his own apprehension, false swearing, and tampering with evidence, for his post-shooting conduct. The State contended defendant shot Coulanges to "settle th[eir] beef"; defendant argued he shot Coulanges in self-defense. There were no eyewitnesses to the shooting. Defendant was sentenced to an aggregate prison term of fifty-three years, with a forty-two-and-one-half-year parole ineligibility term.

On appeal, defendant does not contest the jury's finding that he fatally shot Coulanges. Defendant challenges the trial court's instructions, evidentiary rulings, and failure to grant his Reyes[1] motion on the endangering charge. In the alternative, defendant argues his sentence was excessive.

More particularly, in his counseled merits brief, defendant raises the following points for our consideration:

---

[1] State v. Reyes, 50 N.J. 454 (1967).

POINT I

THE JUDGE COMMITTED REVERSIBLE ERROR WHEN HE DENIED . . . DEFENDANT'S REQUEST FOR A JURY INSTRUCTION ON THE LESSER-INCLUDED HOMICIDE OFFENSE OF PASSION/PROVOCATION MANSLAUGHTER.

POINT II

THE MODEL JURY CHARGE ON "USE OF FORCE UPON AN INTRUDER" UNDER N.J.S.A. 2C:3-4(C) WRONGLY TELLS THE JURY THAT WHEN EVALUATING THE REASONABLENESS OF A DEFENDANT'S BELIEF IN THE NEED TO USE FORCE AGAINST AN INTRUDER, THE JURY SHOULD VIEW THE SITUATION AS A "REASONABLE PERSON WITH A DETACHED VIEWPOINT" WOULD VIEW IT, RATHER THAN A REASONABLE PERSON SITUATED AS . . . DEFENDANT WAS; THE "DETACHED VIEWPOINT" REQUIREMENT IS NOWHERE IN THE RELEVANT STATUTE AND SHOULD NOT HAVE BEEN INSTRUCTED TO THIS JURY.  (Not raised below)

POINT III

THE JUDGE IMPROPERLY RULED, IN CONTRAVENTION OF N.J.R.E. 701 AND STATE V. MCLEAN, [205 N.J. 438 (2011),] THAT A DETECTIVE COULD OFFER HIS LAY OPINION TO THE JURY THAT CERTAIN SOCIAL-MEDIA POSTS BY DEFENDANT WERE THREATENING TO THE DECEDENT WHILE THE DECEDENT APPEARED, IN HIS SOCIAL-MEDIA RESPONSES, TO BE "TRYING TO KEEP THE PEACE."

POINT IV

THE JUDGE VIOLATED N.J.R.E. 608(B)(1) WHEN HE BARRED [TRIAL] COUNSEL FROM EXPLORING ON CROSS-EXAMINATION OF THE STATE'S JAILHOUSE-INFORMANT WITNESS THAT THAT WITNESS HAD PREVIOUSLY FALSELY ACCUSED SOMEONE OF MURDER.

POINT V

THE COURT SHOULD HAVE GRANTED THE MOTION FOR A JUDGMENT OF ACQUITTAL ON COUNT FOUR, ENDANGERING AN INJURED VICTIM, BECAUSE THE STATE ENTERED NO PROOFS TO SHOW THAT THE DECEDENT WAS ALIVE FOR MORE THAN A FEW MOMENTS AFTER BEING SHOT; ALTERNATIVELY, A NEW TRIAL SHOULD BE ORDERED BECAUSE THE JURY INSTRUCTION DID NOT EXPLAIN THAT LEAVING A DECEASED VICTIM IS NOT COVERED BY THAT STATUTE.

POINT VI

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE AND A RESENTENCING REMAND IS REQUIRED.

In his pro se supplemental brief, defendant raises an additional point, contending:

DEFENDANT'S FUNDAMENTAL RIGHT TO DUE PROCESS AND A FAIR TRIAL WAS VIOLATED WHEN THE PROSECUTOR WITHHELD VIABLE IMPEACHMENT MATERIAL CONTRARY TO BRADY V. MARYLAND, 373 U.S. 83[] (1963).

4

Having considered defendant's arguments in view of the trial record and guiding legal principles, we are persuaded by the contentions raised in point I and conclude the failure to instruct the jury on passion/provocation manslaughter warrants reversal of defendant's murder conviction. We address the contentions raised in points II through V of defendant's counseled brief, and the sole point raised in his pro se brief, for guidance in the event of a retrial. In view of our disposition, it is unnecessary to reach defendant's sentencing argument raised in point VI.

I.

On the night of the shooting, defendant gave two Mirandized[2] statements to police. In his initial statement, defendant told police he knew Coulanges for more than a decade and they had lived together in the Keoghs' family home, but they were estranged at the time of the shooting. Defendant claimed his parents, David and Cindy Keogh, treated Coulanges "like a son," but Coulanges disrespected, threatened, and stole from the family, and "attacked [defendant's] father a long time ago." Two years before the homicide, Coulanges "had gone missing," then returned and "continuously lied" and "stole from [defendant.]"

---

[2] See Miranda v. Arizona, 384 U.S. 436 (1966).

According to defendant, Coulanges threatened the Keogh family and "had altercations with [David]."[3]  Defendant claimed Coulanges had mental health issues, requiring hospitalization.  He told police Coulanges threatened to shoot him in the past "several times," and defendant saw Coulanges with a gun five or six years before the shooting.

Turning to the incident, defendant stated Coulanges banged on the door to his carriage house, adjacent to the Keoghs' residence, and told defendant "[w]e need to handle this."  Defendant said when he "walk[ed] outside," Coulanges "started to pull a gun on [him]" and they "got into a wrestling match."  A scuffle ensued.  Defendant stated he disarmed Coulanges and "instinctively" shot Coulanges two times – first to the right thigh and then to the chest.  Defendant thought "[his] life was in danger."  He claimed the shooting occurred on the porch of the carriage house.

Immediately after the shooting, defendant did not call emergency services.  He shut the door and left Coulanges on the porch.  Defendant told police he was "[d]istraught," so he "sat down for a while"; watched a baseball news show; then called his mother, Cindy.

---

[3]  Because the parties share the same surname, we use first names for ease of reference, intending no disrespect in doing so.

A-0565-22

In his second statement to police, defendant claimed he did not know whether Coulanges was dead. He "panicked" and "aimed low." Defendant said "[he] wasn't trying to kill him."

Cindy and David also gave statements to police on the night of the shooting. Police made no arrests at that time.

During the ensuing five-week investigation, among other things, police: spoke with the Keoghs' neighbors, and Coulanges's family members and friends; conducted a forensic examination of defendant's cell phone; acquired geolocation tracking for defendant's, Cindy's, and David's phones; reviewed video from the Keoghs' and a neighbor's security cameras; obtained social media posts between defendant and Coulanges; and analyzed the ballistic evidence recovered from the scene, including the bullet hole in the deck of the carriage house.

The investigation revealed after Cindy arrived home, she and defendant left the residence and met David at his office in a nearby town. After the family returned home, Cindy finally called 9-1-1 – nearly two hours after defendant shot Coulanges. Police found Coulanges's body lying face down on the porch, with a gun and ejected magazine close by.

A-0565-22

Based on the investigation, which the State contended revealed defendant's "acts of deception," he was arrested on February 14, 2019, and detained pending trial.

In May 2019, defendant was charged in a multi-count Somerset County indictment with: first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(4); third-degree endangering an injured victim, N.J.S.A. 2C:12-1.2(a); five counts of false swearing, N.J.S.A. 2C:28-2(a); fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1); and fourth-degree possession of a large-capacity magazine, N.J.S.A. 2C:39-3(j). The same indictment also charged Cindy and David with various offenses including hindering apprehension, false statements, and endangering an injured person. Cindy and David are not parties to this appeal; their matters are pending disposition in the trial court.[4]

---

[4] As we noted in our recent prior opinion, State v. Keogh, ___ N.J. Super. ___, ___ (App. Div. 2025) (slip op. at 3 n.3), the present appeal was calendared back-to-back with the State's appeal from an interlocutory order, granting Cindy's and David's motion to dismiss the endangering count against them. We affirmed the court's order in that matter while our disposition in the present matter was pending. Id. at 23. As we explained in our opinion, id. at 5, we previously granted the State leave to appeal from two other orders, effectively: (1) severing Ryan's murder trial from Cindy's and David's trial, State v. Keogh, No. A-1623-

During the seven-week trial, the State called thirty witnesses, including: neighbors, who heard the gunshots; Coulanges's family members, who testified about his peaceful nature, mental health difficulties, and problems with drugs, alcohol, and theft; Coulanges's friend, who dropped him off near the Keoghs' residence on the day of the shooting; law enforcement witnesses, who testified about their extensive investigation; and the medical examiner, who performed an autopsy on Coulanges's body. Through the testimony of Detective Sergeant Randy Sidorski of the Somerset County Prosecutor's Office, the State also introduced into evidence defendant's recorded statements to police and social media posts between defendant and Coulanges.

Through forensic evidence presented at trial, police determined defendant deleted two calls he made to Otto Bowens approximately twenty-five minutes after the shooting. At trial, Bowens testified he knew both defendant and Coulanges through the music industry. Bowens acknowledged defendant called him after the incident and said he shot Coulanges. Bowens also identified the gun recovered by police at the scene as the gun he gave defendant "to get rid of" the year prior to the shooting.

---

20 (App. Div. July 22, 2021) (slip op. at 2); and (2) reversing the court's order suppressing David's and Cindy's statements to police, State v. Keogh, No. A-1355-21 (App. Div. June 28, 2022) (slip op. at 11).

The State also presented the testimony of Barrick Wesley, who told the jury about his interactions with defendant while they both were detained in the Somerset County Jail. According to Wesley, defendant said he shot Coulanges twice and asked about the law on self-defense.

Regarding the homicide, defendant told Wesley he argued with Coulanges about the possessions Coulanges left at the Keogh residence, but defendant believed Coulanges stole from his family in some way and they were "even now." Wesley also testified defendant asked Coulanges to come to his home without triggering the sensor on his neighbor's home. Concerning the confrontation, Wesley testified defendant relayed Coulanges "apparently became upset because he didn't get what he felt was fair. He went outside and started making a lot of noise, banging on windows and banging on doors."

On cross-examination, trial counsel extensively questioned Wesley about the parameters of his cooperating plea agreement with the State. Trial counsel also thoroughly explored the names of at least ten other individuals, against whom Wesley agreed to testify. Pertinent to this appeal, Wesley was questioned about his recantation testimony against Taron Hill, who was convicted of double murder in 2007.

Defendant did not testify. He presented the testimony of Cindy and David, both of whom acknowledged the falsity of their statements to police. Specifically, Cindy testified before calling 9-1-1, she devised a plan that they should all tell the police "[Coulanges] had the gun." Cindy admitted she lied to police about the gun and the timeline of events on the day of the shooting. Although Cindy confirmed she did not witness the fatal confrontation, she maintained Coulanges "rushed" defendant. David admitted he provided false testimony to law enforcement, but maintained defendant told them there was a struggle.

Defendant also called an expert in forensic pathology, who opined Coulanges "likely . . . bled to the point of death in two to three minutes."

The jury deliberated for three days. Among other evidence, the jurors requested playback of defendant's statements to police. The jury returned a guilty verdict on all counts charged in the indictment, except one false swearing charge.

II.

We first address defendant's argument, raised in point I, that the trial court erred by failing to instruct the jury on passion/provocation manslaughter. At the charge conference, the State requested the court charge aggravated and reckless

11

manslaughter as lesser-included offenses of murder. Defendant objected, but requested a passion/provocation manslaughter charge if the court were inclined to grant the State's application.

To support its application for the lesser-included aggravated and reckless manslaughter charges, the trial prosecutor first cited defendant's sworn statement to police "[t]hat there was a struggle over the gun and that [defendant] shot [Coulanges] instinctively." The prosecutor clarified defendant told police he "struggled with the victim, s[tat]ing [Coulanges] had a gun and [defendant] stripped the gun from him and shot him." The prosecutor also cited Cindy's testimony that defendant told her "there was a struggle" and David's testimony "there was a confrontation."

But the State opposed defendant's "generic request" for a lesser-included passion/provocation charge in view of "the paucity of evidence" other than defendant's "encounter" and "argument" with "the victim . . . on the porch." Trial counsel declined the court's invitation to reply to the State's argument.

The trial court granted the State's request to charge aggravated and reckless manslaughter offenses, but declined to charge passion/provocation manslaughter. Agreeing with the State's assertions, the court concluded the charge was not supported by the facts and "r[an] a risk of confusion."

Defendant now argues his statement to police, introduced into evidence by the State, supported a passion/provocation charge for two alternative reasons. In his statement, defendant claimed Coulanges: (1) "drew a gun on defendant and the two men then argued over the gun, resulting in defendant shooting Coulanges"; and (2) "rushed defendant and engaged in a struggle with him." Thus, defendant argues "[e]ven if the jury believed [he] had the weapon before the incident and grabbed it and shot Coulanges as a result of Coulanges attacking him without a weapon," the jury could have concluded "Coulanges committed a battery against defendant" and "defendant over-responded in self-defense and shot Coulanges." Defendant asserts either theory supports a passion/provocation charge.

The State maintains there was no rational basis for a passion/provocation charge because "Bowens, . . . Wesley, and defendant's own parents completely gutted defendant's statement to police, particularly regarding who brought the gun to [defendant's] porch." The State further contends social media messages between the former friends confirmed defendant – not Coulanges – "did the threatening," and ballistic evidence demonstrated "Coulanges was likely already disabled [by the first bullet] when he was killed [by the second bullet]."

Our Supreme Court has repeatedly recognized the critical importance of "[a]ccurate and understandable jury instructions in criminal cases" to ensure a defendant's right to a fair trial. State v. Galicia, 210 N.J. 364, 386 (2012) (quoting State v. Concepcion, 111 N.J. 373, 379 (1988)). The jury "charge must provide a 'comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" Ibid. (quoting Concepcion, 111 N.J. at 379); see also State v. Carrero, 229 N.J. 118, 127 (2017). "Thus, the court has an 'independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'" State v. Baum, 224 N.J. 147, 159 (2016) (alteration in original) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). If a defendant challenges the instruction before the trial court, "[e]rroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." State v. McKinney, 223 N.J. 475, 495-96 (2015) (alteration in original) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)).

Pursuant to N.J.S.A. 2C:1-8(e), "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." To satisfy the rational-basis

standard, "the court must conclude not only that the offense is included in the charged offense but also that the evidence at trial presents a rational basis for the jury to acquit the defendant of the greater offense and convict him or her of the lesser." State v. Brent, 137 N.J. 107, 123 (1994). "[S]heer speculation does not constitute a rational basis"; an "adequate reason" is necessary. Id. at 118-19.

The rational-basis test applies when, as in this case, a defendant requests a lesser-included offense. See Carrero, 229 N.J. at 128. The court is then "obligated, in view of [the] defendant's interest, to examine the record thoroughly to determine if the rational-basis standard has been satisfied." State v. Alexander, 233 N.J. 132, 142 (2018) (quoting State v. Crisantos, 102 N.J. 265, 278 (1986)).

"In deciding whether the rational-basis test has been satisfied, the trial court must view the evidence in the light most favorable to the defendant." Carrero, 229 N.J. at 128. "A defendant is entitled to an instruction on a lesser offense supported by the evidence regardless of whether that charge is consistent with the theory of the defendant's defense." Brent, 137 N.J. at 118. If the rational-basis test is satisfied, a trial court's failure to issue the requested instruction "warrants reversal of the defendant's conviction." Ibid. Our

15

Supreme Court has characterized the rational-basis test for inclusion of a lesser-included-offense instruction as "a low threshold." Carrero, 229 N.J. at 128.

Passion/provocation manslaughter is defined as a "homicide which would otherwise be murder," but "is committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). "Thus, passion/provocation manslaughter is considered a lesser-included offense of murder:  the offense contains all the elements of murder except that the presence of reasonable provocation, coupled with defendant's impassioned actions, establish a lesser culpability." State v. Robinson, 136 N.J. 476, 482 (1994); see also Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter (N.J.S.A. 2C:11-3(a)(1) and (2); 2C:11-4(a), (b)(1) and (b)(2))" (rev. June 8, 2015).

Four elements must be satisfied to convict a defendant of passion/provocation manslaughter:  "(1) the provocation must be adequate; (2) the defendant must not have had time to cool off between the provocation and the slaying; (3) the provocation must have actually impassioned the defendant; and (4) the defendant must not have actually cooled off before the slaying." Carrero, 229 N.J. at 129 (quoting State v. Mauricio, 117 N.J. 402, 411 (1990)). The first two elements are objective; the remaining elements are subjective.

16

Ibid.  Thus, a court should decide whether there is sufficient evidence to satisfy the first two elements, and if so, the remaining elements should be considered by the jury.  Ibid.

The first element is at issue here.  The measure of adequate provocation is whether "loss of self-control is a reasonable reaction."  Mauricio, 117 N.J. at 412.  "The 'provocation must be sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control.'"  Robinson, 136 N.J. at 491 (alterations in original) (quoting Mauricio, 117 N.J. at 412).

The Court has long recognized "passion/provocation can arise in an infinite number of factual settings."  Crisantos, 102 N.J. at 275.  For example, the presence of a weapon or commission of a battery, "can satisfy the provocation requirement."  Carrero, 229 N.J. at 129; see also Mauricio, 117 N.J. at 414.  Even "mutual combat under certain circumstances can constitute adequate provocation to reduce murder to manslaughter, [but] the provocation must be proportionate to the manner of retaliation."  State v. Darrian, 255 N.J. Super. 435, 449 (App. Div. 1992); see also State v. Powell, 84 N.J. 305, 311 n.4 (1980) (noting "[t]he traditional categories of provocative behavior are:  battery, mutual combat, assault, illegal arrest, adultery and injuries to third persons").

However, "[w]ords alone are insufficient to create adequate provocation." Carrero, 229 N.J. at 129.

Further, the Court has

> emphasize[d] that the actual reaction of the defendant is not a consideration at this point in the analysis. It is irrelevant at this stage whether the defendant in question did in fact "lose his cool." Neither the trial court in deciding whether to instruct the jury on the offense nor the jury in determining whether the offense of passion/provocation manslaughter applies should consider at this point how the defendant in fact reacted to the asserted provocation. Rather, both must limit the focus to the nature and adequacy of the provocation itself.
>
> [Mauricio, 117 N.J. at 412.]

In the present matter, we recognize defendant requested the passion/provocation charge without elaborating the bases he now advances before us. See State v. Canfield, 470 N.J. Super. 234, 259-60 (App. Div. 2022), aff'd as modified, 252 N.J. 497 (2023) (observing the determination on jury instructions is "best made in the first instance by the trial court, aided and informed by the arguments of the parties"); see also R. 1:8-7(b). Nonetheless, in view of defendant's request during the charge conference, the court was tasked with thoroughly examining the record to determine whether there was a rational

basis to charge passion/provocation manslaughter.  See Alexander, 233 N.J. at 142.

We are satisfied there was a rational basis to issue a lesser-included passion/provocation charge.  That evidence included defendant's statement to police that he struggled with Coulanges and disarmed him, and the testimony of Cindy and David, which suggested Coulanges engaged in a struggle or confrontation.  Either theory, viewed "in the light most favorable to . . . defendant," Carrero, 229 N.J. at 128, is sufficient to support the use of a passion/provocation charge on these facts.  Even if the jurors did not believe Coulanges was armed with a gun, they could have concluded defendant was provoked by battery, see id. at 129, or mutual combat, see Darrian, 255 N.J. Super. at 449.  Further, we are not persuaded issuance of a passion/provocation instruction would confuse the jury.  The applicable model jury charge specifically addresses issuance of all three lesser-included offenses when supported by the evidence.  See Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter" at 6-10.

Viewing the evidence adduced at trial in favor of defendant, as we must, we conclude the court's failure to issue the requested passion/provocation charge constituted reversible error.  See Brent, 137 N.J. at 118.  In doing so, we reject

the State's argument that because defendant's statement was contradicted by other evidence in the case – including the testimony of his parents, who were called as defense witnesses, and Bowens – there was no rational basis to issue a passion/provocation instruction. That credibility assessment was a matter for the jury's consideration. As the court explained in its final instructions, the jurors were permitted to believe all, some, or none of the testimony presented if they believed a witness "knowingly testified falsely to any material facts . . . with an intent to deceive [them]." Model Jury Charges (Criminal), "False in One – False in All" (rev. Jan. 14, 2013); see also State v. Ernst, 32 N.J. 567, 583 (1960). Accordingly, although we are cognizant of the protracted pretrial and trial proceedings in this matter, including the abundance of evidence that contradicted defendant's passion/provocation theory – and self-defense claim – pursuant to the governing law, we are nonetheless constrained to reverse defendant's murder conviction and remand for a new trial.

III.

For the first time on appeal, in his second point, defendant claims the model jury charge on intruder self-defense, closely tracked by the trial court, "misstates the 'reasonable person' standard" set forth in N.J.S.A. 2C:3-4(c), and the interpretative case law. See Model Jury Charges (Criminal), "Justification

Use of Force Upon an Intruder (N.J.S.A. 2C:3-4(c))" (rev. Sept. 12, 2016). Defendant argues the model jury charge erroneously instructs the jury "to view the defendant's actions through a lens of 'reasonableness' that would be employed by 'an ordinary reasonable person <u>with a detached point of view</u>,' rather than as reasonableness is normally measured:  by a reasonable person <u>in the same situation</u>."  Defendant claims the stricter requirement set forth in the model jury charge is inconsistent with the intruder self-defense section of the statute, which "was clearly intended to loosen the requirements for self-defense against an intruder in a dwelling, not tighten them."  We disagree.

The intruder self-defense charge issued by the court included the applicable statutory definition of "reasonable belief" set forth in N.J.S.A. 2C:3-4(c)(2)(a) and (b):

> A reasonable belief exists when a defendant, to protect himself, was in his own dwelling at the time of the offense, or was privileged to be thereon, and that the encounter between the defendant and an intruder was sudden and unexpected, compelling the defendant to act instantly, and the defendant reasonably believed that the intruder would inflict personal injury upon him in the dwelling, or the defendant demanded that the intruder disarm, surrender, or withdraw, and the intruder refused to do so.  Personal injury means physical pain, temporary disfigurement or impairment of physical condition.

A-0565-22

[See Model Jury Charges (Criminal), "Justification Use of Force Upon an Intruder" at 2.]

The next paragraph of the charge issued tracked the model jury charge's language verbatim:

> I instruct you that a reasonable belief is different than an honest belief. What is reasonable is not measured by what a defendant found reasonable, or rather what a jury finds reasonable. Thus, the reasonableness of the defendant's belief is based upon an objective standard. That is by how an ordinary reasonable person with a detached viewpoint would view it. The subjective belief based upon the viewpoint of the defendant is immaterial.

[See ibid.]

Contrary to defendant's argument, our state has long recognized when considering self-defense, the jury must apply an "objective test, rather than a subjective exploration of [a defendant]'s psyche" to determine "what they think a reasonable man [or woman] would have done under the circumstances." State v. Bess, 53 N.J. 10, 16 (1968); see also State v. Bryant, 288 N.J. Super. 27, 34 (App. Div. 1996) ("The reasonableness of the defendant's belief is to be determined by the jury using an objective standard of what a reasonable person would have done in defendant's position in light of the circumstances known to defendant at the time the force was used."); State v. Sanders, 467 N.J. Super. 325, 334 (App. Div. 2021) (reiterating the same principle). Further, as the State

22

asserts, defendant's argument was expressly rejected by the Legislature when the Code of Criminal Justice was proposed. See Cannel, New Jersey Criminal Code Annotated, cmt. 2 on N.J.S.A. 2C:3-4 (noting the Legislature "added the word, 'reasonably' before 'believes' throughout th[e] chapter" on General Principles of Justification, N.J.S.A. 3-1 to -11).

When a defendant fails to object to an error regarding jury charges, we review for plain error. R. 1:7-2; see also State v. Funderburg, 225 N.J. 66, 79 (2016). "Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Funderburg, 225 N.J. at 79 (quoting R. 2:10-2). A jury charge which tracks the language of the governing statute, and is consistent with the applicable model jury charge, is not plainly erroneous. See State v. Rodriguez, 365 N.J. Super. 38, 53-54 (App. Div. 2003). We discern no error here.

IV.

In point III, defendant renews his argument that Sidorski impermissibly injected lay opinion testimony, contrary to N.J.R.E. 701, while discussing social media posts between defendant and Coulanges during the summer of 2017. He argues the court erroneously overruled trial counsel's objection to Sidorski's characterization of defendant as confrontational and threatening. The State

counters Sidorski testified to the facts, not his opinion. Regardless, the State argues, "Sidorski personally observed and found those threats through his investigation" and, as such, his testimony was consistent with the rule. In the alternative, the State argues Sidorski's "fleeting words" were harmless in view of his three-day testimony and the overall strength of the State's case.

After confirming Sidorski "read through th[e] posts" made between June and August 2017, the prosecutor asked the detective, "[c]ould you give us a sense of whether [Coulanges] or . . . defendant is confrontational?" Trial counsel objected; the prosecutor agreed to rephrase the question; and the court sustained the objection. The following exchange ensued, in pertinent part:

[PROSECUTOR:] Can you describe the posts?

[SIDORSKI:] Yes. Generally speaking, [Coulanges] was asking for some clothing back, and my opinion, [defendant] --

[PROSECUTOR:] Well, not your opinion. We don't . . . want you to express an opinion, but can you describe having read the posts, how would you describe them?

[SIDORSKI:] Confrontational.

[PROSECUTOR:] Which person is confrontational?

[SIDORSKI:] [D]efendant.

24 <span>A-0565-22</span>

> [PROSECUTOR:] How is [Coulanges] reacting to the posts?

Trial counsel again objected, arguing "the posts speak for themselves. We don't need an interpretation from this witness." The court overruled the objection. Sidorski answered, "[Coulanges] seemed to be more trying to keep the peace, just being more easygoing." After explaining the posts between defendant and Coulanges concerned their "music collaboration," the exchange continued:

> [PROSECUTOR:] Did you see any evidence of threats?
>
> [SIDORSKI:] Yes.
>
> [PROSECUTOR:] Could you tell the jury what you read in the Instagram posts?
>
> [SIDORSKI:] [D]efendant seemed to make a threat to —

Once again, trial counsel objected, arguing the inquiry "call[ed] for speculation" and the jury would "read the posts and form their own opinion." The court overruled the objection and Sidorski responded, "[i]t seemed like . . . defendant made a threat to . . . Coulanges." Sidorski then read various posts between Coulanges and Sidorski, including those he considered "evidence [of] a threat" by defendant to Coulanges.

25

"We review the trial court's evidentiary ruling 'under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Williamson, 246 N.J. 185, 198-99 (2021) (quoting State v. Prall, 231 N.J. 567, 580 (2018)). We only reverse those "rulings that undermine confidence in the validity of the conviction or misapply the law." State v. Weaver, 219 N.J. 131, 149 (2014).

Because the alleged error was brought to the judge's attention, we review for harmful error, see State v. Mohammed, 226 N.J. 71, 86 (2016), that is, whether the error is "clearly capable of producing an unjust result," R. 2:10-2. "[I]n appeals involving the erroneous admission of improper police officer lay testimony, the nature and extent of the admitted testimony is balanced against the strength of the prosecution's case beyond that testimony in determining whether the court's error requires a new trial." State v. Allen, 254 N.J. 530, 550 (2023).

N.J.R.E. 701 governs lay witness testimony and provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness' perception; and

(b) will assist in understanding the witness' testimony or determining a fact in issue.

Our Supreme Court has held, pursuant to N.J.R.E. 701, lay opinion testimony "can only be admitted if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function." State v. McLean, 205 N.J. 438, 456 (2011). As to the first requirement, the witness's perception "rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." Id. at 457. Secondly, the testimony must "assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 458; see also State v. Singh, 245 N.J. 1, 5 (2021) (reaffirming "N.J.R.E. 701 requires only that testimony be rationally based on the witness's perception and that such testimony help the jury").

In the present matter, Sidorski's characterization of the social media posts between defendant and Coulanges exceeded the bounds of N.J.R.E. 701. Sidorski's knowledge of the posts was not based on his personal perception; he read the historical posts and formed an opinion about the senders' intentions. Nor did Sidorski's testimony aid the jury's understanding of the posts which, as trial counsel argued, "sp[oke] for themselves." Whether the social media posts

27

evinced defendant's confrontational or threatening manner were characterizations to be drawn exclusively by the jury.

However, we conclude the error was harmless. Sidorski's passing comments constituted a small portion of his multi-day testimony. Nonetheless, if the matter is retried, the State should refrain from eliciting testimony concerning law enforcement's characterization of the social media posts.

V.

We next address defendant's overlapping challenges raised in point IV of his counseled brief and the sole point of his pro se brief. In point IV, defendant argues the trial court violated N.J.R.E. 608(b), and his federal and state constitutional rights of confrontation and to due process. To support his argument, defendant contends the court erroneously barred trial counsel from eliciting testimony that Wesley falsely accused Hill of double murder as Hill later was "exonerated" by the Attorney General's (AG) Conviction Review Unit (CRU). In his pro se brief, defendant asserts the State withheld Brady[5] material concerning three defendants against whom Wesley testified. We are unpersuaded.

---

[5] Brady v. Maryland, 373 U.S. 83 (1963).

Weeks prior to Wesley's testimony, trial counsel advised the court the defense lacked "adequate discovery into the ultimate decision by the [AG]'s Office" concerning Hill's exoneration. Trial counsel sought from the State the AG's certification and moving papers supporting its application for the vacatur of Hill's conviction. Trial counsel asserted "at some point" the court must decide whether the information was reliable as the defense intended to cross-examine Wesley about his recantation and Hill's exoneration. The prosecutor acknowledged Hill's conviction was "vacated" and the subject of media reports. Claiming the State provided discovery from CRU regarding Wesley's recantation, the prosecutor argued a hearing was unnecessary. To support his argument, the prosecutor cited the AG's directive concerning jailhouse informants' testimony and then proposed Rule 3:13-3(b)(1)(K).[6]

Citing the abundance of information furnished by the State concerning the cases in which Wesley cooperated, the court found the State went "above and beyond" to comply with the anticipated rule change. The court determined the

---

[6] Off. of the Att'y Gen., Admin. Directive No. 2020-11, Directive Regarding Testimony of Jailhouse Informants (Oct. 9, 2020). Effective September 2022, subparagraph (b)(1)(K) of Rule 3:13-3 requires discovery of various information regarding the anticipated testimony of jailhouse informants.

defense should have "ample information" for cross-examination on Wesley's "five prior instances of corroboration" and "the specific details" of the benefits he received from his testimony. The court thus concluded the defense did not need additional information from the AG's Office regarding Hill's case. However, the court denied defendant's application without prejudice as premature, noting Wesley could be recalled as a witness if it appeared defendant were deprived "a fair opportunity to cross-examine [him]." Following Wesley's testimony, defendant made no such application.

On direct examination, Wesley acknowledged he recanted his testimony after he testified against Hill and claimed he did so because he was threatened in prison by gang members on Hill's behest. The prosecutor did not elicit testimony that Hill was exonerated following CRU's investigation. Nor did the prosecutor ask Wesley whether his cooperation in any other trials led to convictions against those defendants.

On cross-examination, the prosecutor objected when trial counsel asked, "as a result of your testimony against [Hill, he] was convicted, correct?" At sidebar, the prosecutor expressed his "preemptive" concerns about any inquiry suggesting the vacatur of Hill's conviction "[w]as proximately attributed to . . . Wesley's recantation." The prosecutor argued that line of inquiry "will plant the

30

A-0565-22

seed in the jury's mind that [Wesley's] testimony is falsely going to convict [defendant]." The prosecutor also noted he did not elicit testimony from Wesley regarding the outcome of any trials during which Wesley testified on the State's behalf.

Acknowledging the State provided "extensive discovery," which permitted fodder for cross-examination about Wesley's recantation, trial counsel asserted he intended to question Wesley about the veracity of his recantation and that "Hill was freed by the same state who prosecuted him." Citing an unspecified news article, the prosecutor claimed "there may have been [an] identification issue" in Hill's case. The prosecutor thus maintained Wesley's recantation "[wa]s not the proximate cause" of the vacatur of Hill's verdict. Ultimately, trial counsel argued it was proper "to ask [Wesley] one simple question, 'if he knows if [Hill is] in jail or not anymore.'" The court denied trial counsel's request.

Cross-examination of Wesley spanned more than 150 transcript pages. Trial counsel extensively questioned Wesley concerning his lengthy criminal history, generous plea deal with the State, prior testimony against at least ten other defendants aside from Hill, and his false testimony against Hill and two other defendants. Concerning Hill, trial counsel explored Wesley's recantation

of his inculpatory trial testimony and later assertion that he was threatened to recant. Trial counsel also questioned Wesley about his 2020 interview by CRU while Wesley was in jail for his current charge. Wesley acknowledged he was interviewed "about the fact that [he] had now recanted testimony."

Defendant now expressly asserts the court failed to hold an N.J.R.E. 104 hearing pursuant to N.J.R.E. 608(b). But he also states a hearing was unnecessary because Hill's exoneration was undisputed and there was "strong evidence" Wesley falsely accused Hill of double murder. Citing our Supreme Court's decisions in State v. Guenther, 181 N.J. 129 (2004), and State v. Terry, 218 N.J. 224 (2014), defendant asserts the court erroneously prevented trial counsel from questioning Wesley about "Hill's exoneration to prove Wesley falsely accused Hill of murder." Defendant argues the court prevented the defense from demonstrating Wesley's false accusation against Hill "was exactly what he was doing again to defendant in this case."

N.J.R.E. 608(b)(1) provides:

> In a criminal case, a witness'[s] character for truthfulness may be attacked by evidence that the witness made a prior false accusation against any person of a crime similar to the crime with which defendant is charged if the judge preliminarily determines, by a hearing pursuant to Rule 104(a), that the witness knowingly made the prior false accusation.

This exception to character evidence testimony followed the Court's decision in Guenther, where the Court established a non-exclusive test to determine when such impeachment evidence is admissible against a victim-witness. 181 N.J. at 157. The factors include: (1) "whether the credibility of the victim-witness is the central issue in the case"; (2) "the similarity of the prior false criminal accusation to the crime charged"; (3) "the proximity of the prior false accusation to the allegation that is the basis of the crime charged"; (4) "the number of witnesses, the items of extrinsic evidence, and the amount of time required for presentation of the issue at trial"; and (5) "whether the probative value of the false accusation evidence will be outweighed by undue prejudice, confusion of the issues, and waste of time." Ibid.

Citing N.J.R.E. 403, the Court recognized, "[t]rial courts are well qualified to determine when such evidence will create the prospect of a mini-trial and when the probative value of that evidence is outweighed by the risk of undue prejudice, confusion of the issues, or waste of time." Id. at 155. Thereafter, in Terry, the Court extended its holding in Guenther to any "key witness" whose credibility is central to the case. 218 N.J. at 242.

In the present matter, we agree with defendant's assertion that an N.J.R.E. 104 hearing pursuant to N.J.R.E. 608(b)(1) was "unnecessary." Based on our

33

review of the record, it does not appear defendant renewed his request for additional information from the AG's Office concerning vacatur of Hill's conviction or a hearing concerning that information. But we are not persuaded the court's ruling deprived defendant of a fair trial. Trial counsel extensively questioned Wesley about his recantation testimony, including CRU's interview about that testimony. A hearing was unnecessary because the State acknowledged Hill's recantation testimony was admissible as a prior false accusation.

Further, although the vacatur of Hill's conviction was undisputed, we glean from the record – albeit from the parties' summary of media reports during argument before the trial court – Hill's conviction was vacated for reasons other than Wesley's false testimony, including the "identification issue" referenced by the trial prosecutor. Accordingly, the record is devoid of competent evidence that Hill's conviction was vacated based solely on Wesley's recantation. In our view, eliciting testimony concerning the vacatur of Hill's conviction was "outweighed by undue prejudice, confusion of the issues, and waste of time." See N.J.R.E. 403; Guenther, 181 N.J. at 157. We therefore discern no error in the court's evidentiary ruling. See Williamson, 246 N.J. at 198-99.

B.

Little need be said regarding defendant's pro se <u>Brady</u> argument. Defendant contends, prior to sentencing, he determined the State failed to disclose "Wesley had accused three innocent men of murder in three separate cases." In its responding brief, the State cites trial counsel's cross-examination of Wesley and counters the trial prosecutor provided discovery concerning two of those men, including Hill. The State asserts the third man's name was revealed in pretrial materials provided to the defense. According to the State, the trial prosecutor's efforts to obtain information from the Essex County Prosecutor's Office concerning Wesley's alleged cooperation in that multi-defendant case tried three decades ago were met in vain – and the third individual was found not guilty after trial.

Due process requires the State disclose exculpatory evidence. <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963). A <u>Brady</u> violation occurs when the prosecution suppresses evidence, which is material and favorable to the defense. <u>See</u> <u>State v. Martini</u>, 160 N.J. 248, 268 (1999). "Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>State v. Robertson</u>,

438 N.J. Super. 47, 67 (App. Div. 2014) (quoting State v. Knight, 145 N.J. 233, 246 (1996)).

Having considered defendant's contentions in view of the governing law, we conclude they lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(2). We discern no Brady violation here.

## VI.

In point V, defendant challenges his conviction for endangering an injured person. At the close of the State's case, but after defendant's forensic pathologist testified, trial counsel summarily moved for a judgment of acquittal pursuant to State v. Reyes, 50 N.J. 454 (1967), on all counts charged in the indictment, and did not rebut the State's summary of the evidence adduced as to each charge. Citing our decision in State v. Moon, 396 N.J. Super. 109 (App. Div. 2007), defendant now claims the trial court erroneously denied his Reyes motion regarding the endangering charge only. Defendant's contentions are unavailing.

Rule 3:18-1 provides, in pertinent part:

> At the close of the State's case or after the evidence of all parties has been closed, the court shall, on [the] defendant's motion or its own initiative, order the entry of a judgment of acquittal of one or more offenses charged in the indictment . . . if the evidence is insufficient to warrant a conviction.

"In assessing the sufficiency of the evidence on an acquittal motion, we apply a de novo standard of review." State v. Williams, 218 N.J. 576, 593-94 (2014); see also State v. Cruz-Pena, 243 N.J. 342, 348 (2020). "We must determine whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." Williams, 218 N.J. at 594 (citing Reyes, 50 N.J. at 458-59).

N.J.S.A. 2C:12-1.2 provides, in pertinent part: "A person is guilty of endangering an injured victim if he causes bodily injury to any person . . . and leaves the scene of the injury knowing or reasonably believing that the injured person is physically helpless, mentally incapacitated, or otherwise unable to care for himself." As applied to defendant, the statute is comprised of the following three elements, requiring the jury find defendant: (1) "knowingly caused bodily injury to another"; (2) "the injured person was physically helpless, mentally incapacitated, or otherwise unable to care for himself/herself"; and (3) "he/she left the scene of the injury knowing or reasonably believing that the injured person was physically helpless, mentally incapacitated, or otherwise unable to care for himself/herself." Model Jury Charges (Criminal), "Endangering Injured Victim (N.J.S.A. 2C:12-1.2)" (rev. Mar. 14, 2016).

In Moon, the defendant placed a gun to the victim's head, pulled the trigger, and kicked the victim's body to check if he was alive. 396 N.J. Super. at 112. We noted the State did not present any evidence showing that the victim "exhibited any sign of life after he was shot or that [the] defendant or anyone else present knew or reasonably believed that he was alive and incapacitated, helpless or unable [to summon assistance] after he collapsed." Id. at 115. Indeed, the medical examiner opined "the extensive damage to [the victim]'s brain would have incapacitated him instantly, and he was dead or dying when his face hit the ground." Id. at 113.

We therefore held N.J.S.A. 2C:12-1.2(a) did not apply to the facts adduced at trial in Moon. Id. at 117. We determined the State's evidence was inadequate to permit the jury to find the victim was physically helpless or "that [the] defendant left [the victim] on the street knowing or reasonably believing that he was anything other than dead." Ibid.

Defendant's reliance upon Moon is misplaced. Unlike the evidence presented in that case, the medical examiner here testified Coulanges was shot in the leg and torso "at least six feet away" from defendant; not at point blank range. Further, the evidence adduced at the time of defendant's acquittal motion,

including the testimony of his forensic pathologist, suggested Coulanges survived the shooting for at least two to three minutes after he was shot.

After defendant shot Coulanges, defendant neither rendered aid nor called emergency services. Instead, defendant left Coulanges for dead, went inside the carriage house, and watched a baseball news show until his mother arrived. There is no evidence in the record suggesting defendant checked whether Coulanges was alive or determined he was dead. Cf. Moon, 396 N.J. Super. at 112. Indeed, it was only after defendant and his parents met at David's office and devised a story to relate to police that Cindy finally called emergency services when they arrived home – almost two hours after defendant shot Coulanges. Viewing the evidence in its entirety, and giving the State the benefit of all favorable inferences, we conclude the State presented sufficient evidence to warrant the jury's consideration of the endangering charge under N.J.S.A. 2C:12-1.2(a).

Nor are we persuaded the jury instruction on the endangering charge was erroneous. The charge issued by the trial court tracked the model jury charge. Defendant neither requested a specific charge nor objected to the charge as given. Initially approved on April 18, 2005 and revised on March 14, 2016 – nearly nine years after we issued our decision in Moon – the model jury charge

39

does not require the court instruct the jury the victim must not be dead.  We discern no error, let alone plain error, in the charge issued.  See R. 1:7-2; Funderburg, 225 N.J. at 79; see also Rodriguez, 365 N.J. Super. at 53-54.

Affirmed in part; reversed and remanded in part.  Jurisdiction is not retained.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0565-22